312

BROOKS v. ST. LOUIS–SAN FRANCISCO
RY. CO. et al.

DIKIS et al. v. SAME.

ST. LOUIS–SAN FRANCISCO RY. CO. v.
PRIOR LIEN BONDHOLDERS'
COMMITTEE et al.

Nos. 13105–13107.

Circuit Court of Appeals, Eighth Circuit.

Feb. 8, 1946.

Rehearing Denied March 6, 1946.

See, also, 46 F.Supp. 120.

William V. Hodges, of Denver, Colo. (Daniel Bartlett, of St. Louis, Mo., and Hodges, Vidal & Goree and Walter M. Simon, all of Denver, Colo., on the brief), for appellant St. Louis-San Francisco Ry. Co., Debtor.

Chelsea O. Inman, of St. Louis, Mo. (Phil W. Davis, Jr. and W. N. Maben, both of Tulsa, Okl., on the brief), for appellants Lola Brooks, Adm'x of Estate of F. S. Brooks, deceased, and John E. Dikis, Adm'r of Estate of Robert E. Lee, deceased, and others.

George D. Gibson, of Richmond, Va. (Lowenhaupt, Waite, Chasnoff & Stolar and Jacob Chasnoff, all of St. Louis, Mo., and Hunton Williams, Anderson, Gay & Moore and Henry W. Anderson, all of Richmond, Va., on the brief), for appellee Prior Lien Bondholders' Committee.

Leonard D. Adkins, of New York City (Carter, Bull & Garstang and Emmet T. Carter, all of St. Louis, Mo., and Cravath, Swaine & Moore and Robert T. Swaine, all of New York City, on the brief), for appellee Consolidated Bondholders' Committee.

Edwin S. S. Sunderland, of New York City (Charles P. Williams, of St. Louis, Mo., and Davis, Polk, Wardwell, Sunderland & Kiendl, Thomas O'G. FitzGibbon, and James L. Homire, all of New York City, on the brief), for appellee Fort Scott Bondholders' Committee.

Bryan, Cave, McPheeters & McRoberts and Thomas S. McPheeters, all of St. Louis, Mo., and White & Case and Fitzhugh McGrew, all of New York City, for appellee Bankers Trust Co., Trustee, Kansas City, Fort Scott and Memphis R. Co. Refunding Mortgage.

Fordyce, White, Mayne, Williams & Hartman and Thomas W. White, all of St. Louis, Mo., and Rathbone, Perry, Kelley & Drye and Alexander M. Lewis, all of New York City, for appellee Central Hanover Bank & Trust Co., Trustee, St. Louis-San Francisco R. Co. Prior Lien Mortgage.

Nagel, Kirby, Orrick & Shepley, Ethan A. H. Shepley, and William G. Pettus, Jr., all of St. Louis, Mo., and Milbank, Tweed

**314**

& Hope and Orville W. Wood, all of New York City, for appellees Chase Nat. Bank of City of New York and John A. Aid, Trustees, St. Louis-San Francisco R. Co. Consolidated Mortgage.

Before GARDNER, THOMAS and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

There are here three appeals, Nos. 13,-105, 13,106 and 13,107, all from an order of the District Court approving a plan of reorganization for the St. Louis-San Francisco Railway Company. As these appeals raise substantially the same questions and were consolidated for purpose of presentation, they will be considered together. The plan of reorganization reduced the capitalization of the Railway Company from about $480,-000,000 to about $247,000,000. The capitalization as so reduced is less than the secured bonded indebtedness of the Railway Company by over $110,000,000. The plan provides for the issuance of new securities to go to the holders of the bonds. The allocation and apportionment of these securities consisting of first mortgage bonds, second mortgage bonds and stock, among the secured creditors is not here material because all the holders of the old bonds have accepted the new plan. The old bonds were all secured by various mortgage liens on the property of the Railway Company. Under the plan there is nothing apportioned to the unsecured creditors nor to the stockholders.

The appellants are the Railway Company, representing its stockholders and unsecured creditors, and Lola Brooks, Administratrix, and John E. Dikis, Administrator, who are the owners of claims allowed in the proceedings in the bankruptcy court based upon judgments against the Railway Company on account of damages for personal injuries and death resulting from the negligence of the Railway Company prior to the period of receivership and reorganization proceedings.

The debtor's predecessor in interest was incorporated in 1876 and went into reorganization in 1896. It was again reorganized in 1916 at which time the debtor was organized to take over the properties. The capital structure of the debtor was a matter of adverse criticism by the Interstate Commerce Commission as early as 1923. By 1932 its credit became exhausted, its taxes became delinquent and its financial stability precarious. On its application for a Reconstruction Finance Corporation loan in 1932, the Commission held that it was over-capitalized, and as a condition to authorization of a Reconstruction Finance Corporation loan the Commission required the debtor to agree to submit a plan for reduction of fixed charges. Such a plan was proposed but did not become effective and receivers were appointed November 1, 1932. On May 16, 1933, the debtor filed its petition under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The 1932 plan was ultimately held inadequate to meet debtor's needs and thereafter a new plan was proposed by three bondholders' committees. This plan, after wide investigation and careful consideration by the Commission, was submitted to the Court for its approval and it is from the order entered April 10, 1945, approving that plan that these appeals are prosecuted.

The substantial objection to the plan is that the new capitalization is too low and that it should have been fixed at an amount high enough to have satisfied all secured claims and leave some equity to be allocated to the stockholders and unsecured creditors.

In the original brief filed on behalf of the Railway Company, its stockholders and unsecured creditors, the questions at issue are stated substantially as follows: (1) The Interstate Commerce Commission proceeded on the assumption that the rights and interests of the unsecured creditors and the debtor in debtor's assets were and are without value, such an assumption or finding being unfair, inequitable, arbitrary and without support in the evidence; (2) that the burden of debt of the debtor as found or assumed by the Commission was determined by the trial court without correction and without any allocation of the proceeds derived from the operation of the property during reorganization, and such burden is grossly more than warranted by the evidence or the applicable law; (3) that if the earnings during reorganization period be properly applied and the debtor's earning power properly considered, there is no reasonable basis for a finding that claims of unsecured creditors and the interest of the debtor are without value.

In support of these contentions it is argued (1) that it was beyond the power of the Commission to fix the total new capitalization at an amount less than the total claims of bondholders, and (2) that the total claims of the bondholders must be computed without regard to the interest

that has accumulated on their principal during the long course of reorganization proceedings. In considering these issues we must have in mind the province of the court as distinguished from the province of the Interstate Commerce Commission, as that question has been determined by controlling decisions.

Ordinarily, the underlying necessity for the reorganization of a railroad company is that it can not support its existing capitalization. Under the equity practice there was no authority vested in the court to change or recapitalize an overburdened railroad company, nor to pare down secured debts without a sale of the security. With the adoption of Section 77 of the Bankruptcy Act, however, the Interstate Commerce Commission was given the initial power of determining the new capitalization of a reorganized railroad. The Act made it possible to eliminate the foreclosure and sale under mortgages against the railway property, and conferred upon the reorganization court the power to determine the value of conflicting claims. The Act also conferred upon the Interstate Commerce Commission the duty and power of determining the new capitalization. In the determination of this important question it is necessary to ascertain the prospective earning power of the Railway Company considered as a going concern. While jurisdiction of the property of the Railway Company and its management, maintenance and operation during the process of reorganization is vested in the court, certain matters were left to the determination of the Interstate Commerce Commission, and its determination of those questions if sustained by substantial evidence and not violative of legal standards, is conclusive on the courts. Ecker et al. v. Western Pacific R. Corporation, 318 U.S. 448, 63 S. Ct. 692, 87 L.Ed. 892; Group of Investors v. Chicago, M. St. P. & P. R. Co., 318 U. S. 523, 63 S.Ct. 727, 87 L.Ed. 959.

Manifestly, if the value of the new securities does not exceed the amount of the secured claims, then neither the unsecured claims nor the stockholders can benefit by any change in the apportionment of the new securities. The general creditors and stockholders are confessedly junior in all respects to the claims of the bondholders. Louisville Trust Co. v. Louisville, N. A. & C. R. Co., 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130; Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed.

931; Case et al. v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. In the final analysis, the controlling if not the only question presented by these appeals is whether the action of the Commission in determining the capitalization of the Railway Company as represented by the new securities, approved by the trial court, should be set aside in order to bring about some allocation of the new securities to the general creditors and stockholders.

The Supreme Court, in Ecker v. Western Pacific R. Corp., supra, and Group of Investors v. Chicago, M. St. P. & P. R. Co., supra, has indicated the relative functions to be performed by the Commission and the reorganizing court. In the Ecker case it is said [318 U.S. 448, 63 S.Ct. 705]:

"These reorganizations require something more than contests between adversary interests to produce plans which are fair and in the public interest. When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest. Congress outlined the course reorganization is to follow. It established standards for administration and placed in the hands of the Commission the primary responsibility for the development of a suitable plan. When examined to learn the purpose of its enactment, Section 77 manifests the intention of Congress to place reorganization under the leadership of the Commission, subject to a degree of participation by the court.

"It is clear from the discussions and the statute itself that there was recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public creditors and stockholders. The resulting legislation was an attempted balance between the power of the Commission and that of the court."

Again the court said:

"The power of the court does not extend to participation in all responsibilities

of the Commission. Valuation is a function limited to the Commission, without the necessity of approval by the court. * * *

"The function of valuation thus left to the Commission is the determination of the worth of the property valued, whether stated in dollars, in securities or otherwise. One of the primary objects of the bill was the elimination of obstructive litigation on the issue of valuation and the form finally chosen approached as near to that position as seemed to the draftsmen legally possible. Judicial reexamination was not considered desirable. None of the findings required of the judge under subsection e relate specifically to valuation. Congress apparently intended to leave the determination of valuation 'of any property for any purpose under this section' to the Commission."

Again it is said:

"Another restriction on court action is that the determination as to whether the plan is 'compatible with the public interest' rests, as valuation does, with the Commission. * * *

"Capitalization is an essential factor bearing on an efficient transportation system for shipper, investor and consumer. The development of the capitalization of the reorganized company which is entrusted solely to the Commission under the requirement that the plan be compatible with the public interest is that relating to the total amount of issuable securities and the quality of the securities to be issued. *So long as legal standards are followed the judgment of the Commission on such capitalization is final.*" (Italics supplied.)

Again the court said: "Assuming at this point that the Commission's valuation is sound and reached by allowable methods, a matter discussed later in this opinion [at page 477 of 318 U.S.] at page 709 of 68 S.Ct., we hold that the elimination of the claims of stockholders and creditors which are valueless from participation in the reorganization is in accordance with valid provisions of section 77, sub. e."

In Massachusetts Mutual Life Ins. Co. v. Securities and Exchange Commission, 8 Cir., 151 F.2d 424, 430, we said: "Since there is a 'rational basis' in fact for the finding of the Commission and no 'clearcut' error of law by either Commission or court, we are not inclined to disturb the conclusion * * *." To the same effect see Archer v. Securities and Exchange Commission, 8 Cir., 133 F.2d 795; Board of Trade v. United States, 314 U.S. 534, 62 S. Ct. 366, 86 L.Ed. 432.

It is clear that the Commission has the power to limit total capitalization and its finding on the question of reorganization value is not subject to review. It is urged, however, that the Commission arbitrarily assumed a value, and complaint is made that the Commission did not, in words at least, find or fix the value of the property involved. In view of the very extensive investigation by the Commission of every element or factor having any conceivable bearing on the question of future earning capacity, including the condition and nature of the physical properties, the past earnings record and all circumstances which bear upon the question of future earnings or value, it can not reasonably be said that the Commission assumed anything.

The Supreme Court, in Group of Investors v. Milwaukee R. Co., supra, speaking of the work of the Commission as reflected by the record in that case, said [318 U.S. 523, 63 S.Ct. 736]: "It reviewed freight and total revenues, passenger revenues and their trend, operating revenues and expenses, and maintenance and efficiency of operation for various periods ending in 1938. It gave consideration to estimated future taxes, emergency freight charges, and certain wage factors. It reviewed the amounts of income available for payment of interest in each of the years from 1921 to 1938. It considered the original cost of the properties, the cost of reproduction new, the cost of reproduction less depreciation, and the value for rate making purposes—each of which was substantially in excess of the capitalization which it authorized."

The investigation made by the Commission in the instant case has been as searching and as thorough as that referred to in the Milwaukee case. Here, as in the Milwaukee and Western Pacific cases, the Commission based its determination as to the capitalization largely upon the earning capacity of the railroad, and in the Milwaukee case the court said: "Certainly there is no constitutional reason why earning power may not be utilized as the criterion for determining value for reorganization purposes."

For reorganization purposes the value depends upon its earning capacity. "* * * the commercial value of property consists in the expectation of income

from it * * *." Galveston, H. & S. A. R. Co. v. State of Texas, 210 U.S. 217, 28 S.Ct. 638, 639, 52 L.Ed. 1031. As said by the Supreme Court in Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 685, 85 L.Ed. 982, "The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable."

▉▉▉ These authorities dispose of appellants' contention that the original cost of reproduction should govern reorganization value. The determination by the Commission of the aggregate amount of securities that may be issued is in effect a finding of total value for reorganization purposes. The Commission, as has already been observed, had before it and considered every element or factor affecting value including the evidence as to the original cost of reproduction of the physical properties. It held extended hearings at various times between July, 1933, and February, 1944, and a perusal of the record makes apposite what is said by the court below [59 F.Supp. 417, 424]: "The extent of the record on these questions is appalling, and it is difficult for the court to understand how anyone could contend that the Commission has omitted to go into every phase of the debtor's existence."

The trial court, in referring to the work and findings of the Commission, further said: "The Commission has * * * gone exhaustively into the history of the debtor corporation, including the development of its physical and financial structure and that of its subsidiaries; into the characteristics of its properties and their condition and improvements; into the traffic experience, year by year, by commodities and revenue tons carried, and by flow of traffic over various parts of the System, and by the prospect for the future; into operating revenues for each year since 1915 by classes and compared by ratios to the total in the preceding year; into expenses and operating ratios since 1915, both maintenance and improvement, and into taxation; into the net earnings available for interest since the debtor has been in existence; and elaborately into the elements of physical value."

▉▉▉ In the appeals of Brooks and Dikis, the same contentions are urged as in the appeal of the debtor, but they make some further contentions with reference to the Commission's findings. It is said that the Commission overlooked certain unmortgaged assets, namely, the cash on hand at the time of the receivership, November 1, 1932, and the cash thereafter collected by the receivers before the order segregating income for the benefit of bondholders, and it is urged that they should share in the cash assets on a parity with bondholders. As compared with the claims of bondholders, their claims are so small that their share would be negligible, if indeed not infinitesimal. The Commission found that the mortgage liens covered the entire system and that the greater part of the cash at least was subject to the lien of the various mortgages. Each of the mortgages covers all income. The trustees under the mortgages made proper demand for the income, and the court, by an order entered March 10, 1933, appointing receivers, directed the trustees to hold the mortgaged property, including the rents, issues and profits thereof. The bankruptcy court thereafter confirmed and adopted this order. The lien of the mortgages related back to the inception of the proceedings and was entitled to preference over the competing claims of general creditors. In Mortgage Loan Co. v. Livingston, 8 Cir., 45 F.2d 28, 33, we said: "So here, the receiver, while not appointed in a separate suit instituted by the mortgagees, was functioning on behalf of all creditors with due regard to priorities of claims and liens on the property of the bankrupt." See, also, In re Wakey, 7 Cir., 50 F.2d 869; Central Hanover Bank & Tr. Co. v. Philadelphia & Reading Coal & Iron Co., 3 Cir., 99 F.2d 642.

▉▉▉ Any equitable interest which Brooks and Dikis may assert in the mortgaged property is subject to the payment of the bonds, as the existence of a junior lien does not unsettle the rights of the senior claimants. Louisville Tr. Co. v. Louisville, N. A. & C. R. Co., supra; Case et al. v. Los Angeles Lumber Products Co., supra.

▉▉▉ It is also urged by Brooks and Dikis that they were in fact not general creditors, but entitled to some preferential treatment. True, they may have liens in the states in which their judgments were entered but these liens are subject to pre-existing liens and certainly junior to the lien of the bondholders. It is also urged that they were entitled to priority of payment

under the equity rule allowing priority to those who furnish material for the operation of a railroad within a limited time before receivership. Proceedings to determine that question seem to be pending and we do not believe a plan of reorganization should embody an adjudication or classification of individual claims, and we express no opinion on the question.

Again, it is urged that there are current assets of the value of $50,000,- 000 which should be available to pay debts. From the current assets on hand the court ordered payment of the 1945 interest, and manifestly, the Railway Company as a going concern can not, even for the purpose of paying creditors, be left stranded for want of operating funds. These so-called funds on hand belonged to the Railway Company and while they may tend to enhance somewhat the value of the new stock and bonds, these stocks and bonds are held by those who have preferred claims and if the funds could be taken from the company for the purpose of paying debts they should be applied upon the remaining unsatisfied preferred claims of the bondholders, so that no possible benefit could inure to the stockholders or unsecured creditors. The finding of the Commission as to the amount due on the preferred claims is challenged and it is argued that the bondholders were not entitled to interest from the time of the initiation of the reorganization proceedings. The argument, however, overlooks the fact that the property in reorganization was all subject to the mortgage liens and these mortgages cover not only the payment of the principal but also the payment of interest. Interest on secured claims to the effective date of the plan is entitled to the same priority as the principal. Consolidated Rock Products Co. v. DuBois, supra; Ecker v. Western Pacific R. Corporation, supra; Case v. Los Angeles Lumber Products Co., supra; Louisville Joint Stock Land Bank v. Radford, 295 U. S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A. L.R. 1106; American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway, 233 U.S.

261, 34 S.Ct. 502, 58 L.Ed. 949; Group of Investors v. Milwaukee R. Co., supra. The time as of which the claims of creditors should be computed was fixed as January 1, 1944. From that time the interest on the securities will be the new rate, but up to that time it will be computed on the old securities at the contract rate. This determination, we think, is reasonable and equitable and violative of no legal principle.

In a reply brief filed by the debtor subsequent to oral argument on leave of court, it is suggested that the decision of this case be held until it is determined whether there will be an order of confirmation brought to this court on appeal, and that such an appeal should be considered before we decide the issues in the present appeal. We can see no justification for further delay. We need not here anticipate what questions for review might be presented on such an appeal further than to observe that Section 77 provides that when a plan is approved by the Commission and the District Court, it shall then be submitted to the security holders whose interests are of value and are affected by the plan, and after vote by them it shall come again to the District Court to be confirmed. If the plan is accepted by more than two-thirds of those voting in each class to which submission is required, then the District Court, we think, will not again consider the merits of the plan. If the plan has been accepted and the acceptance has been properly obtained it will then be confirmed. In the instant case, the plan has already been accepted by more than two-thirds of those voting in each class to which submission was required. Certainly, in those circumstances there should be no further delay in this proceeding which has already been pending for more than twelve years.

As the order appealed from is sustained by substantial evidence and the Commission in reaching its determination has applied proper standards as declared by controlling decisions of the Supreme Court, it is affirmed.