### In re REALTY ASSOCIATES SECURITIES CORPORATION.
### No. 200, Docket 20500.

Circuit Court of Appeals, Second Circuit.

July 23, 1947.

Writ of Certiorari Denied Dec. 8, 1947.

See 68 S.Ct. 218.

---

388

CLARK, Circuit Judge, dissenting.

Hooker, Alley & Duncan and Root, Ballantine, Harlan, Bushby & Palmer, all of New York City (William P. Palmer and James B. Alley, both of New York City, of counsel), for the Debtor and its stockholder, appellants.

Newman & Bisco, of New York City (Perry A. Hull, of New York City, of counsel), for Manufacturers Trust Co., Indenture Trustee, appellant.

Percival E. Jackson, of New York City (Percival E. Jackson and Theodore N. Tarlau, both of New York City, of counsel), for Vanneck Realty Corporation, appellee.

Lewis, Marks & Kanter, of Brooklyn, and Julius Silver, of New York City (Julius Silver, of New York City, Lloyd B. Kanter, of Brooklyn, and Jack L. Rappaport, of New York City, of counsel), for Bondholders' Protective Committee, appellee.

Roger S. Foster, Sol., and Robert S. Rubin, Associate Sol., both of Philadelphia, Pa., George Zolotar, Sp. Counsel, of New York City (Alexander Cohen, of Philadelphia, Pa., and Ezra Weiss and Kiva Berke, both of New York City, of counsel), for Securities and Exchange Commission.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

These appeals present questions as to the interest payable upon bonds of the debtor after they became due on October 1, 1943. The debtor is a New York corporation organized to deal in mortgages and real estate securities. Prior to 1933 it had outstanding three issues of 6% bonds maturing respectively in 1937, 1939 and 1943. Pursuant to a composition in bankruptcy, effective as of July 10, 1933, the bonds then outstanding were reduced in amount and made subject to a new Indenture dated July 10, 1933, which fixed the maturity date for all the bonds as October 1, 1943 and provided that they were to bear interest at 5% per annum payable out of earnings, any unpaid portion of the interest to be cumulative and payable with the principal at maturity. The old bonds were required to be "stamped" to indicate the modification effected, and to be registered. On October 1, 1943 the principal amount of the outstanding stamped and registered bonds was $5,710,400 and, as the debtor had paid only about 3% interest out of earnings, the accumulated, accrued and unpaid interest thereon was $1,286,646.43. On September 28, 1943, three days before the maturity date, the debtor filed a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. On April 2, 1945, upon the petition of the debtor and its sole stockholder, Consolidated Realty Corporation, a wholly-owned subsidiary of Reconstruction Finance Corporation, the court made an order dismissing the reorganization proceedings for the unique reason that funds were available to pay all debts, including the bonds with interest thereon up to April 15, 1945, the date set for payment. The order of dismissal, however, reserved to the court jurisdiction to determine the amount of interest payable and, particularly, whether the rate after maturity should be 5% or 6% and whether interest was payable on that portion of the bondholders' claim which represented the unpaid interest which had accrued before the bonds matured on October 1, 1943. By its order of August 5, 1946, which is now before us on appeal,[1] the court decided that after October 1, 1943 interest was payable at the rate of 6% both on the principal of the bonds and on the unpaid interest then due. The debtor and its sole stockholder contend that the 5% rate should have been applied to principal and no interest on interest allowed.

■■ The first question is whether the contract between the debtor and the bondholders provides for a 5% interest rate after maturity as well as before. This turns upon the proper construction of the Indenture of July 10, 1933 which expressly declares that the rights and remedies of the parties and of the holders of the stamped bonds shall be governed by the New York law. It is common ground that under the New York decisions interest continues at the specified contract rate rather than at the legal rate of 6%, if the contract provides for payment of interest "until the principal shall be paid."[2] In Article III, section 1 of the debtor's Indenture the company covenanted "that it will pay to the registered holder of each Stamped Bond * * * until the reduced principal of each such Bond shall be duly paid * * * interest on the reduced principal amount thereof from July 10, 1933 at the rate of five per cent (5%) per annum * * *" Because of the phrase "duly paid" and a similar expression in Article IV, section 1,[3] the district judge concluded that the word "duly" was used to denote the obligation of prompt payment at maturity and limited the debtor's promise to pay interest to the period prior to the maturity of the bonds. We cannot agree with this construction and are fortified in the view that no such limitation was intended by the

[1] Other features of the order of August 5, 1946, raising different questions, were considered in Kelby v. Manufacturers Trust Co., 2 Cir., 162 F.2d 350.

[2] Taylor v. Wing, 84 N.Y. 471; O'Brien v. Young, 95 N.Y. 428, 430, 47 Am.Rep. 64; Agency of Canadian Car & Foundry Co. v. American Can Co., 2 Cir., 258 F. 363, 372, 6 A.L.R. 1182.

[3] "That it will duly and punctually pay the principal (as reduced) of every Stamped Bond, together with interest at the rate of five per cent (5%) per annum accrued thereon and not theretofore paid, on October 1, 1943; * * * "

word "duly" because Article VI, which deals with "remedies of Trustee and Bondholders," provides in section 4 that any moneys collected by the Trustee pursuant to this Article after an "event of default" (nonpayment at maturity being specified as one such event) shall be applied to payment of the principal and interest then owing, "with interest at the rate of five per cent (5%) per annum on the overdue principal." Obviously this provision leaves no doubt about the trustee's right to collect only 5% interest after maturity of the bonds. But the bondholders say that section 8 of Article VI, which provides that "on and after October 1, 1943 the registered owner of any Stamped Bond may maintain an action in his own name and in his own right to recover any amount due thereon for principal or interest," gives them an unconditional right to sue, and implies that they may collect interest at the legal rate after maturity. This would mean that the debtor need pay only 5% if the Trustee collected, but must pay 6% if the bondholders sued. We cannot accept such an interpretation of the contract. It would introduce an inconsistency into the debtor's obligations which the parties cannot reasonably be believed to have intended; for it would result in making it necessary for all the bondholders to sue personally, or in a class action, in order to recover the full amount of their claims, and would prevent the trustee from adequately asserting their rights. Certainly the trustee is not to be understood to be so crippled; their individual rights are supplementary to his, but he is fully armed to protect them. Accordingly we think it clear that the contract of the parties provides that interest is to continue at the 5% rate after maturity of the bonds.

 Irrespective of the contract provisions, the bondholders advance two alternative theories to support their right to the 6% rate. The first may be called the "judgment theory": it asserts that allowance by the court of the claim on the bonds is a judgment which bears interest at the legal rate from the date of the Chapter X petition. In a straight bankruptcy case, In re John Osborn's Sons & Co., 2 Cir.,

177 F. 184, 29 L.R.A.,N.S., 887, this court decided, relying upon National Bank of Commonwealth of New York City v. Mechanic's Nat. Bank, 94 U.S. 437, 24 L.Ed. 176, that allowed claims in bankruptcy are of the same efficacy as judgments with respect to bearing interest, where the assets of the bankrupt are sufficient. In that case the bankrupt had made no contract providing for the payment of interest, and the principal appellants contend that the decision does not control the case at bar for that reason. Assuming without decision that the attempted distinction would be invalid in an ordinary bankruptcy, we are not convinced that the "judgment theory" is applicable in a Chapter X reorganization, where the very purpose of the proceeding is to keep the debts in statu quo until a plan can be adopted under which the debtor may continue in business without having its property burdened with judgments. It is, of course, necessary to liquidate the debts, but the proposal is not that they will be paid at maturity but that they will be extended in whole or in part by means of substituted obligations; and it would run entirely counter to this purpose to treat them as peremptory demands, like judgments, upon which damages in the form of interest for delay in payment will commence to fall due as soon as the reorganization petition is filed. Until the "plan" is proposed and accepted, the debtor gets a moratorium; and the debts do not become finally due except to the extent and in the manner that the "plan" provides. That the practice has been to treat the contract rate of interest as continuing to the effective date of the plan in Chapter X and railroad reorganizations is amply shown by the cases cited by the debtor. although the point does not appear to have been discussed. See Ecker v. Western Pacific R. Corporation, 318 U.S. 448, 455, 63 S.Ct. 692, 87 L.Ed. 892; Brooks v. St. Louis-San Francisco Ry. Co., 8 Cir., 153 F.2d 312, 318, certiorari denied, 328 U.S. 867, 66 S. Ct. 1365, 90 L.Ed. 1638; Chicago, Milwaukee, St. Paul & Pacific R. R. Co. Reorganization, 254 I.C.C. 707, 712; In re Adolph Gobel, Inc.,[1] S.D.N.Y. In re McKeeson & Robbins, Inc., 8 S.E.C. 853, 876. Assuming that payment of the bonds under the

---

[1] No opinion for publication.

order of April 2, 1945 was not a plan of reorganization, the proceeding ended by the payment of claims which had always been awaiting a "plan" and never went to "judgment"—and the same conclusion follows a fortiori, if that order was the equivalent of a "plan." For the foregoing reasons we think the "judgment theory" inapplicable to change the contract rate of interest.

The alternative theory upon which the bondholders claim the 6% rate asserts that the moratorium obtained by the reorganization was solely for the debtors' benefit and therefore upon equitable principles the legal rather than the contract rate should be applied. Great reliance is put upon Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, which was decided after the district court's decision in the case at bar. In the Vanston opinion, 329 U.S. at page 165, 67 S.Ct. at page 241, the court said: "It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."

In the case at bar the bondholders contend that the reorganization petition was not filed in "good faith" and that the whole proceeding has been a successful effort to secure a moratorium solely in the interest of the debtor. Conceivably Chapter X may permit a debtor to hold off its creditors, even though it has sufficient assets to pay them, merely because its business will suffer disproportionately if it is compelled to make the sacrifice. See In re Loeb Apartments, 7 Cir., 89 F.2d 461. However, we shall do no injustice to the bondholders if we assume that the law is to the contrary and that a moratorium is proper only when appropriate to the protection of creditors. It is true that the debtor's assets on September 28, 1943 would seem to have been ample to pay the bonds maturing on October 1, 1943, and there were substantially no other debts. Nevertheless, we cannot know whether the mortgages and real estate, which constituted more than half of the total assets, were readily realizable, nor can we be sure that if the bondholders had been permitted to engage in a general scramble for them, with all the expenses and waste incident to that kind of distribution, there would have been enough to go around. The debtor's petition, to be sure, is singularly unconvincing; it did not allege that without reorganization the bondholders would not be paid—it said merely that they "might" not be. Almost immediately two creditors holding some $10,000 of bonds moved to dismiss the petition for lack of good faith, and on November 1, 1943, Judge Moscowitz denied their motion, saying that nothing could be a greater disservice to the creditors than not to give them the protection and benefit of the reorganization statute. The moving bondholders took no appeal from this order; nor did any others intervene to appeal, or make any motions of their own. For 18 months after that decision, so far as appears, no one questioned the good faith of the proceedings or suggested that the district judge was not right in saying that if the petition were dismissed all would suffer. Quite aside from any question of estoppel arising from the order of November 1, 1943, we think it would be most inequitable to permit creditors who so long acquiesced in the pendency of the proceeding, now to say that all the time it was nothing but a bad-faith moratorium to keep them out of their money. If, contrary to our assumption, a debtor may procure a moratorium solely in its own interest, the bad-faith argument is irrelevant. Under either view, therefore, we find no equities to override the bargain which the parties made for themselves, namely that overdue principal should bear interest at the rate of 5%.

Little need be added as to the claim of interest upon the interest accrued and unpaid on October 1, 1943. In the Vanston case, although the indenture specifically provided "for payment of interest on unpaid interest" (329 U.S. at p. 159, 67 S.Ct. 238), the Supreme Court, on the basis of equitable principles, did not allow it since "first mortgage bondholders would have been enriched and subordinate creditors would have suffered a corresponding loss, because of a failure to pay when payment had been prohibited by a court order entered for the joint benefit of debtor, cred-

itors, and the public". 329 U.S. at page 166, 67 S.Ct. at page 242. In the case at bar the indenture makes no provision for interest on interest. Compound interest is never favored and, generally speaking, is allowable under New York law only when the accrued interest has been merged into and become part of the principal debt. See Newburger-Morris Co. v. Talcott, 219 N.Y. 505, 114 N.E. 846, 3 A.L.R. 287. If granted here, its grant can rest only upon the theory that the bondholders' claims (including principal and accrued interest) were in "judgment," or upon the theory that the bondholders were unjustly subjected to a moratorium in the debtor's interest only. The inapplicability of either theory has already been shown in our discussion of the rate of interest payable on overdue principal. Accordingly the claim for compound interest must fail.

Manufacturers Trust Company as Indenture Trustee has appealed from so much of the order of August 5, 1946 as relates to the application of an interim payment of interest authorized on December 10, 1943. The application complained of produces a difference in the amount payable to bondholders only if they are to receive more than the 5% contract rate of interest. In view of our decision that they are to. get but 5%, the issues raised by Manufacturers Trust Company's appeal have become of only academic interest and require no discussion.

The order is modified to conform with the foregoing opinion on the appeal of the debtor and its sole stockholder, with appellate costs to them, and is affirmed on the appeal of the Indenture Trustee.

CLARK, Circuit Judge (dissenting).

This is an interesting problem; I agree with Judge Swan's scholarly analysis except for his rejection of the "judgment theory." As to this also, what he says has much force; but I incline to believe that the opposite conclusion is the more equitable. This is now a contest between a solvent debtor and its creditors on a direct obligation which has become fixed and final by court proceedings between the parties.

It should not be affected by the abortive reorganization proceedings. As the opinion substantially concedes, allowance of a claim in bankruptcy fixes it, just as does a judgment, and an ordinary judgment bears interest at the legal rate. The situation is one therefore where a debtor who has availed himself of the bankruptcy provisions ultimately is able to pay in full; he should not then be permitted to make use of the statute to reduce his claim. Obviously here, except for the proceedings, the creditors would have taken judgment at once; they should not be deprived of that advantage by the debtor's unassented-to act.

That this was a reorganization, rather than an ordinary bankruptcy, proceeding would seem not to change this situation. It is still only a question between the debtor and its creditors. The cases in railroad reorganization were cases involving equities between classes of creditors. The Vanston case, supra, 329 U.S. 156, 164, 165, 67 S.Ct. 237, 241, is, I believe, important authority for this view, because it stresses the "touchstone" of "a balance of equities between creditor and creditor or between creditors and the debtor." (Italics added.) This is said just after a discussion of the two differing situations, thus: "To allow a secured creditor interest where his security was worth less than the value of his debt was thought to be inequitable to unsecured creditors. * * * But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." What is considered fair in measuring obligations of different classes of creditors—and eventually assented to and approved as provided by law in a plan of reorganization—should be different from what a debtor by his unilateral act may secure by way of lessening his obligation upon his payment in full. These views would mean that at least from the time of allowance, the claim, including the interest due thereon at the time, would bear interest at the legal rate of 6 per cent.